No. 31,806

Lottie May Kaufman, *Appellee* and *Cross-Appellant*, v: W. H. Smith, Administrator of the Estate of Hilbert Kaufman, Deceased, *Appellee;* Florence McDermott and John J. McDermott, Her Husband, Leoline Sommer and Lyman H. Sommer, Her Husband, George H. Kaufman and Elizabeth Kaufman, His Wife, *Appellants.*

(36 P. 2d 1029)

Opinion filed November 3, 1934.

*O. A. Keach* and *W. D. Jochems,* both of Wichita, for the appellants.

*Austin M. Cowan, C. A. McCorkle, J. D. Fair, W. A. Kahrs* and *R. H. Nelson,* all of Wichita, for the appellee and cross-appellant.

The opinion of the court was delivered by

Dawson, J.: This was an action to determine the correct interpretation of an antenuptial contract and to settle certain rights of the litigants thereunder.

It appears that in 1915 the late Hilbert Kaufman, of Wichita, who was then a widower with three children, two adult daughters and a son in his later teens, became engaged to marry this plaintiff, Lottie May Garberick. She and Kaufman entered into a written contract whereby Miss Garberick waived her statutory rights in her husband's property and also as his widow if she should survive him. In lieu thereof she agreed to accept $10,000 as her portion if his estate should amount to $40,000, or one-fourth of his estate if it should amount to less than $40,000. But if his estate should exceed the appraised value of $85,000 she was to receive one-half of the surplus over and above that figure.

Controversial features of the contract read:

"Whereas, the said Hilbert Kaufman has, by a wife now deceased, three children, the youngest of, whom is almost an adult, who, it is agreed by the parties hereto, should be provided for out of the property of said Hilbert Kaufman, and

. . . . . . . . . . . . .

"Whereas, the said Lottie May Garberick is satisfied with, and approves of,

the provisions made herein and hereby for herself and for the children of the said Hilbert Kaufman, and with all of the different provisions, covenants and agreements herein contained; now,

"Therefore, it is hereby agreed by and between said parties: That . . . in case the said Lottie May Garberick shall live with the said Hilbert Kaufman as his wife during his lifetime and shall survive him, at his death she shall take no share of his estate by inheritance nor under the statutes of descents and distributions . . . except as herein provided; but, in lieu and instead of an interest in the estate of the said Hilbert Kaufman under the law, the said Lottie May Garberick shall have paid to her by the administrators or executors of the said Hilbert Kaufman out of the estate of the said Hilbert Kaufman, the sum of ten thousand dollars ($10,000), provided said sum shall not be more than one-fourth in value of the said estate; but in case said sum of $10,000 shall be more than one-fourth in value of said estate at the time of the death of the said Hilbert Kaufman, then, instead of said sum of $10,000, the said Lottie May Garberick shall have paid to her by said administrators or executors a sum equal to one-fourth of the appraised value of said estate, said administrators or executors to have one year in which to make said payment unless there shall be sufficient cash assets on hand out of which it can be made at an earlier time.

"If the appraised value of said estate at the time of the death of the said Hilbert Kaufman shall be more than eighty-five thousand dollars ($85,000), said appraisement to be made fairly and equitably by appraisers to be appointed or approved by the court of probate which shall administer on the estate of the said Hilbert Kaufman, then, in addition to said sum of $10,000 to be paid to Lottie May Garberick as hereinbefore provided, the said Lottie May Garberick shall be entitled to one-half of the surplus of said estate over and above said appraised value of $85,000. Provided that advances made to any of the children of the said Hilbert Kaufman, except advances for their living and current expenses, shall, for the purpose of estimating the value of the estate of Hilbert Kaufman at the time of his death, be considered a part of said estate, and no advances shall be made to the children of the said Hilbert Kaufman for the purpose of defeating any of the provisions of this agreement.

"Subject to the terms of this agreement, all of the real estate, personal property and property of every kind, which the said Hilbert Kaufman shall have at any time during his marriage with the said Lottie May Garberick, shall be subject to his own separate control, alienation and disposition without the joinder or joint consent of the said Lottie May Garberick. . . .

"It is further agreed that, subject to the provisions herein for the said Lottie May Garberick, all of the estate of the said Hilbert Kaufman, which he may have or to which he may be entitled at the time of his death, may be disposed of by him by will, and the said Lottie May Garberick does hereby consent to any will which may be made by said Hilbert Kaufman.

"It is further agreed that in case the said Hilbert Kaufman shall leave no will, then all of the estate which he may have or to which he may be entitled at the time of his death, except such as shall go to the said Lottie May

Garberick by the terms of this agreement, shall be divided among the children or descendants of the said Hilbert Kaufman in accordance with law."

Following the execution of this contract Kaufman and plaintiff were married and lived together until his death on March 8, 1929. Apparently at the time the antenuptial contract was executed Kaufman must have believed himself to be worth about $40,000 and that he might reasonably hope to double that fortune during his lifetime. As it turned out in the remaining fourteen years of his life, he accumulated an estate of the probable value of $300,000 or more —the most of it in real property—although the provision of the contract which required an appraisement of his entire estate at his death was ignored and not performed.

On Kaufman's death an administrator took charge of the estate. The personalty was appraised by the probate court at $76,201.48. All this had been converted into cash except certain shares in a grain company ere this lawsuit was begun. There were considerable charges against the estate, including a mortgage indebtedness of $50,000 against some of Kaufman's real estate. The latter has since been reduced to $42,500.

The parties concerned, plaintiff, the administrator, and the three children, had no difficulty in agreeing that the estate was ample to pay to plaintiff the specific amount named in the antenuptial contract and, accordingly, she was paid $10,000. Furthermore, at the time of Kaufman's death there was apparently no doubt that eventually there would be a substantial surplus over and above $85,000 to divide between the widow and the children; and in the interim it was agreed by the parties concerned that she should be paid the sum of $350 per month, which payments would be taken into account when the precise surplus of the estate above $85,000 should be ascertained and her half of it delivered or set apart to her. Generous sums have likewise been paid over to the three children. Fortunately the estate as it existed in 1929 was so considerable that notwithstanding the great shrinkage in property values since Kaufman's death it is still sufficient to warrant a lawsuit between the widow and the stepchildren over the precise extent of plaintiff's rights under the antenuptial contract.

Controversy first arose in the probate court when the widow filed a specific claim for $10,000 and for one-half the surplus of the estate over $85,000. The probate court ruled that this called for an interpretation of the contract and that the jurisdiction of such mat-

ters was the exclusive function of a court of general equity juris-diction. This action in the district court followed. The evidence developed interesting details but no sharp dispute over the material facts. The trial court made certain findings of fact, which, in part, read:

"II. Shortly after the agreement was made they [Kaufman and plaintiff] married and lived together as husband and wife until Kaufman's death. He died intestate on March 8, 1929, leaving three children by a former marriage, Leoline K. Sommer, George H. Kaufman and Florence McDermott.

"Lottie May Garberick Kaufman has been paid $10,000 as provided in the sixth paragraph of the antenuptial agreement, and also has received payments of $350 a month for a time under a stipulation made in the probate court, and which is made a part of these findings.

"The heirs have also been paid substantial sums from the estate.

"III. The entire estate exceeded the sum of $85,000 at the time of Kauf-man's death."

This was followed by certain conclusions of law, one of which reads:

"II. That it was the intention of the makers of the contract that if the appraised value of the estate at the time of the death of Hilbert Kaufman exceeded $85,000, then his heirs in addition to their share of the first $40,000 were to have the next $45,000, the expenses of the administration and ordinary debts, not including mortgages on real property, to be paid out of that portion of the estate."

The judgment roll, in part, recites:

"That Lottie May Garberick Kaufman was entitled to $10,000 in cash as the value of the estate was more than $40,000, which $10,000 has been paid to her. That if the appraised value of the estate at the time of the death of Hilbert Kaufman exceeded $85,000 then his heirs in addition to their share of the first $40,000 were to have the next $45,000, the expenses of the admin-istration and ordinary debts, not including mortgage on real estate to be paid out of that portion of the estate, to wit: the $45,000.

"That the words, 'Said Lottie May Garberick shall be entitled to one-half of the surplus of said estate over and above said appraised value of $85,000,' were meant to give her one-half of the estate over and above $85,000 accord-ing to its appraised value at the time of Kaufman's death in kind and not in cash, whether personal or real, and as it is admitted that all property over $85,000 in value was real property, that after the first $85,000, according to its appraised value, is set aside, then she should have as her share one-half of all of the property over and above that amount, the same to be determined by appraisal of the property as to its value at the time of his death; the same to be set aside to her, taking into consideration such mortgage or liens that may be upon the property, and if it cannot be set aside in kind, then the property should be sold and she should be given one-half from the proceeds of the sale.

"From this amount should be deducted the total amount which has been

paid to her in sums of $350 per month under the stipulation above referred to as filed in the probate court."

Dissatisfied with this interpretation, the heirs appeal, and the widow presents a cross appeal.

The appellant heirs are quite content that the first $40,000 of the estate should be divided between the widow and themselves in the proportions of $10,000 each, but they contend that the court erred in charging against the next $45,000 the administration expenses, unsecured debts, state and federal taxes and various other items, which at the time this action was tried amounted to $28,549.09. They insist that none of these charges should be paid out of any part of the first $85,000 of the estate but cast against that portion of it which is in excess of $85,000, which in consequence would greatly reduce the "surplus" which is to be divided—one-half to the widow and the other half to the appellant heirs. In other words, the three heirs say that out of the first $85,000 the widow gets $10,000 and no more; that the three heirs should each receive $25,000 without any deductions whatever on account of charges against the estate; and that all proper charges against the estate should be cast against that portion of it which remains after the first $85,000 is taken out of it.

The heirs also contend that the court erred in ruling that only the miscellaneous charges included in the $28,549.09 should be cast against what remains of the estate after the first $85,000 is thus disposed of, but that the mortgage indebtedness against the realty should likewise be charged in the same manner. To illustrate:

Costs of administration, taxes, unsecured debts, etc................ $28,549.09
Balance due on mortgage encumbrance on realty.................. 42,500.00

Total ...................................................... $71,049.09

Appellants insist that this total of $71,049.09 should be charged against what is left of the estate after the first $85,000 is taken out of it—$10,000 to the widow and $75,000 to the three children.

At this point it will serve to shorten discussion to state the view of counsel for the widow and cross-appellant. On her behalf it is argued that by the terms of the antenuptial contract she is altogether excluded as statutory heir, but in lieu thereof she is given two specific portions of the estate: $10,000 out of the first $40,000; and one-half of the surplus over $85,000. They insist that the contract does not say and it is not fairly open to the interpretation that

the children are to have $75,000 divided between them out of the first $85,000. They direct attention to the language of the agreement which declares that aside from whatever is given to the widow, the remainder of the estate, in the absence of a will, "shall be divided among the children of the said Hilbert Kaufman in accordance with law." The widow argues that "in accordance with law" the children are not entitled to a dime until all debts and other legitimate charges against the estate are satisfied. Using the illustration we have set out above, there would be no definite amount to divide among the children until the net surplus above $85,000 is ascertained, although it is quite true that the widow has no concern with the first $85,000 other than that the proper disposition of it will materially affect the size of the "surplus" in which she has a half interest.

On these main features of this controversy a majority of the court regard the contentions of the appellants as so obviously correct and those of the cross-appellant as so manifestly erroneous that there is nothing open for discussion. The text and intent of the antenuptial contract are so plain that they need neither construction nor elaboration, and it only remains for the court to enforce it according to its terms.

Touching the case of *Boulls v. Boulls*, 137 Kan. 880, 22 P. 2d 465, relied on by the cross-appellant, there might be room for the operation of the rule there stated if the widow's first specific claim for $10,000 were resisted, but the plain text of the contract governs her right to half the surplus over $85,000. There will be no surplus over that figure to divide until all debts, secured and unsecured, as well as all other legitimate charges against the estate are satisfied. While the administrator and the probate court have no special concern with the mortgage indebtedness if it is not yet due, it must be taken into account in some equitable fashion before the respective shares of the widow and children in the surplus of the estate can be ascertained and the division effected.

In view of this conclusion the errors in the admission and exclusion of evidence become immaterial; and the other matters suggested in the briefs of counsel for the litigants can readily be unraveled by the trial court once it is advised of our interpretation of the antenuptial contract; so the judgment will be reversed and the cause remanded for further proceedings consistent with the views hereinabove set forth.

DAWSON, J. (dissenting in part): I can only go along with the court on the one point that the mortgage indebtedness should be taken into account before the net surplus over $85,000, in property or in cash, can be ascertained, and divided between litigants. I think Kaufman contemplated that he would probably leave a $40,000 estate to be divided between his widow and his three children—$10,000 each—and he probably believed that he would accumulate a good deal more, perhaps as much as $85,000 during his lifetime; and that the latter amount would pay his widow and three children $10,000 each and be sufficient to satisfy all debts and charges on his estate. This might also result in his three children getting somewhat more than $10,000 each—unless he left a will, which, of course, would govern and limit their rights in his estate, and irrespective of this antenuptial contract. In the more remote contingency that his net estate might be greater than $85,000 he was quite content to agree that his widow should have half the surplus above that figure—doubtless on the reasonable belief that she would help to earn it by faithful discharge of her wifely duties. Suppose Kaufman's estate had been $85,000, neither more nor less. Of course the widow would get nothing beyond the $10,000, but would the three children get $25,000 each? And if so, how would the costs of administration and other lawful charges against the estate be satisfied? To my mind these queries demonstrate the erroneous construction given above to the contract by this court. I therefore dissent.